**In the Interest of C.P. and B.P., Minors.**

**Appeal of: M.P. and P.P., Parents.**

Superior Court of Pennsylvania.

Submitted May 5, 2003.

Filed Nov. 14, 2003.

Bernard Ilkhanoff, Shrewsbury, for appellants.

Martin Miller, York, for Guardian Ad Litem, appellee.

Dorothy Livaditis, York, for York County Children and Youth Services, appellee.

BEFORE: ORIE MELVIN, TODD and TAMILIA, JJ.

OPINION BY TAMILIA, J.:

¶ 1 M.P. and P.P., father and mother respectively, appeal from the July 17, 2002

dispositional Order granting the petition of York County Children and Youth Services (YCCYS) to adjudicate their sons, C.P. and B.P., dependent.[1] Based on our extensive review of the record, we affirm the Order of disposition.

¶ 2 The Order in question, entered after several evidentiary hearings, adjudicated C.P. and B.P. dependent and awarded legal and physical custody of them to the paternal grandmother. Mother was given supervised visitation rights, if the boys desired, and father was ordered to have no contact with the boys. The trial court found that while there was sufficient, clear and convincing evidence presented to find that C.P. and B.P. had suffered treatment, principally at the hand of their father, that caused each of them psychological and emotional damage, the court also found the claim of physical abuse was not established. In its Opinion the trial court stated:

> To the extent that they are at risk, they are at risk of more serious mental health issues. They are at risk from the standpoint of their own safety, and there's indication that the rest of the family may be at risk because of their emotional and psychological state.

> . . .

> It is clear that neither of the parents are [sic] able to relate to either of these adolescent young men in a way that would help them cope with their manifested problems and that they are, therefore, without the proper parental care, control, or subsistence of the type which is specified in the Act.

Trial Court Opinion, Miller, J., 7/17/02, at 5.

¶ 3 On appeal, father and mother argue the trial court erred by finding YCCYS proved by clear and convincing evidence that B.P. was dependent and there was a clear necessity to place him outside the home. They also argue the court erred and abused its discretion by concluding YCCYS employed reasonable efforts to investigate the case and to prevent placement of B.P. outside the home. Appellants' Brief at 4.

¶ 4 The standard of review in dependency cases is broad. *Matter of Read,* 693 A.2d 607, 610 (Pa.Super.1997), *appeal denied,* 555 Pa., 708, 723 A.2d 1025 (1998). The scope of this Court's review, however, is limited in a fundamental manner by our inability to nullify the factual findings of the trial court provided they are supported by competent evidence. *Id.* We accord great weight to the findings of the hearing judge, as he is in the position to observe and rule upon the credibility of the witnesses and all parties who appear before him. *In the Matter of C.R.S.,* 696 A.2d 840, 843 (Pa.Super.1997).

¶ 5 Under 42 Pa.C.S.A. § 6302, Definitions, a dependent child is, *inter alia,* a child who:

(1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. *A determination that there is a lack of proper parental care or control may be based upon evidence of con-*

---

1. In the case before us, there initially were three petitions filed by YCCYS involving appellants' sons, M.P., Jr., C.P., and B.P. Due to the attainment of the age of majority (18) by M.P., Jr., on June 3, 2002, however, the court proceeded to adjudications and disposi-

tions in the interests of only C.P. (DOB 6/20/85), and B.P. (DOB 1/13/88). During the pendency of this appeal, C.P. has also reached age 18 and, as to him, this appeal is now moot.

*duct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, . . .*

*Id.* (emphasis added). "The question of whether a child is lacking proper parental care and control so as to be a dependent child encompasses two discrete questions: whether the child presently is without proper care or control, and if so, whether such care and control are immediately available." *In re D.A.*, 801 A.2d 614, 619 (Pa.Super.2002).

> If a child is adjudicated dependent under the Juvenile Act, he or she cannot be separated from his or her parents absent a showing that the separation is clearly necessary. A decision to remove the child from his or her parents' custody must be reconciled with the paramount purpose of preserving family unity.

*Read, supra* at 609 (quotation and citations omitted).

¶ 6 This case came to the attention of the court when petitions were filed charging dependency of appellants' three sons, M.P., C.P. and B.P., and it was scheduled for hearings before Judge Stephen P. Linebaugh on January 16, 2002. In conformity with the mandate of the Juvenile Act to permit treatment by preserving the family unit through the least restrictive alternatives, the dependency petitions were withdrawn without prejudice following the hearing, thereby permitting the children to remain in the marital home and directing father, who was absent from the home due to a Protection from Abuse Order (PFA), to not return to the home until approval was secured from YCCYS. The court also directed release of medical information concerning father's recent hospitalization, evaluation of father by the Advance Program (dealing with domestic violence), and follow through with any rec-ommendation relative to father's evaluation. (N.T., 1/16/02, at 12–15). Also pursuant to the trial court's directive, YCCYS prepared an initial Family Service Plan (FSP) to support and facilitate efforts to preserve the family unit.

¶ 7 Based on the record before us, documented following multiple successive hearings, we find the record supports the trial court's conclusion the evidence clearly and convincingly established (1) the children were dependent pursuant to the standard required in the Act; (2) YCCYS employed all available resources to effectuate the FSP; and (3) the need for continuing service for this family, at least for the benefit of the remaining minor child, B.P.

¶ 8 The testimony and evidence offered by YCCYS demonstrate in clear and convincing fashion that C.P. and B.P. are dependent children. While the issue as to C.P. is moot, our references to his disabilities are illustrative and supportive of the problems associated with and diagnosed as to B.P. and are indicative of serious family dysfunction, necessitating the finding of dependency and removal from the home.

¶ 9 1. C.P. was a patient of Dr. Sudhakumar Madaposi, M.D., a child/adolescent psychiatrist who diagnosed C.P. as having post-traumatic stress disorders and suffering from physical abuse (N.T., 6/6/02, at 16, 17–18). Father hit him with his cane, punched him, and threatened him with physical harm (N.T., 5/9/02, at 51). It was medically necessary for C.P. to be involved in a mental health treatment program to address the problems and not to have contact with M.P., Sr., until he received treatment (N.T., 6/6/02, at 22).

¶ 10 2. Robert Gordon, a licensed psychologist testified C.P. and B.P. were both patients of his and his psychological evaluation as to both children was admitted into the record (N.T., 6/6/02, at 41). A number

of concerns were presented. B.P. allegedly made homicidal and suicidal threats at school which resulted in his suspension (*id.* at 50). The suspension lasted for three years during which time he was home schooled by his father. During that period, according to B.P., he learned nothing, was in constant conflict with his father, had no freedom to socialize or be involved in sports or other activities, and had problems relating to suicidal thoughts requiring crisis intervention (N.T., 5/9/02, at 38, 39 & 44).

¶ 11 C.P. was diagnosed as having a major depressive disorder, post-traumatic stress disorder, chronic type adjustment disorder with mixed disturbance of emotions and conduct. The primary stresses of C.P. derived from allegedly having been physically and emotionally abused by his father. (N.T., 6/6/02, at 52). Father was extremely controlling, not permitting C.P. go outside of the house or to socialize (*id.,* at 55). Dr. Gordon recommended reinitiating individual psychotherapy, out-patient therapy for C.P. and B.P. for post-traumatic stress issues and anger management for B.P. (*id.,* at 63). The two boys, C.P. and B.P., did not wish to have visits with their father as they were intimidated by him (*id.,* at 66). The psychologist agreed that a court Order directing family counseling as a unit, including involvement of the father, would be appropriate although visitation with the father would not (*id.,* at 67).

¶ 12 3. Corey Richards, a family therapist, testified as to his role in treating the family. Despite counseling provided to the family by his agency, C.P. and B.P. required assessment through crisis intervention on numerous occasions. Richards testified that the emotional and physical well-being of the minors was at risk if father returned home (N.T., 6/19/02, at 18), and that C.P. and B.P. were in fear of seeing him returning home, (*id.,* at 17). The two boys testified in chambers that their parents would leave them alone without advising them where they were going or when they would return (N.T., 5/9/02, at 11).[2] C.P. and B.P. also testified as to the physical and psychological abuse over several years which occasioned flashbacks when father was with them at home (*id.,* at 24), appellants' inadequate home schooling for B.P. (*id.,* at 30–31), and B.P.'s admitted suicidal thoughts and thoughts of hurting others (*id.,* at 44–45). Testimony also was received that mother did not adequately protect C.P. and B.P. (N.T., 7/17/02, at 19, 23), and despite a PFA Order preventing father's return, she permitted him to do so (*id.,* at 100–107). Finally, Richards testified that in his three and one-half years as a therapist with his agency, he had not seen a more dysfunctional family in the dynamics of appropriate roles in emotional care, love, power and the freedom necessary to facilitate bringing young adults into maturity (N.T., 6/19/02, at 102).

¶ 13 4. Sean Conway, a West Manchester police officer, was called as a witness to provide testimony concerning domestic calls. Reading from the police records, he reported eleven calls and police contacts between December 11, 2001 and April 23, 2002. Calls were made by the mother, grandmother and father at different times, as well as one or two station house contacts (N.T., 6/19/02, at 115–124).

¶ 14 5. Leigh Mitten, a family preservation therapist, testified that she believed the lives of C.P. and B.P. were at risk if they had contact with father and that others were also at risk. (N.T., 7/17/02, at 18) While some progress had been made, she

---

**2.** Father is legally blind and not permitted to drive, which necessitates mother driving him anyplace he needs to go. The disability also results in stress between mother and father.

attributed the lack of further meaningful progress to appellants' refusal to invest themselves in the process (*Id.* at 56), and she concluded this was the most dysfunctional family with whom she was ever involved. (*id.,* at 57–58). Mother testified that despite a prior Order prohibiting father from returning home, she permitted him to do so (*id.,* at 101, 106). Further, she expressed concern about the possibility the children would hurt her (*id.,* at 86).

¶ 15 The record is replete with evidence, including testimony and professional evaluations and reports, establishing the dependency of the children, the dysfunction of the appellants/parents, and the need for ongoing intervention for the safety of the children, the family, and that of persons around them. Although one might consider this a case where "too little, too late" has been applied to resolution of the family problems, we agree the remaining child in minority status, B.P., requires continuing agency services. Moreover, as often is the case, the now emancipated children, M.P. and C.P., may well be helpful participants in facilitating agency intervention and in providing support to their mother and grandmother as family members attempt to deal with the intransigence of a handicapped (legally blind) father and a dominated, non-supportive mother. While clear necessity has been established for removal of B.P. from the home at this time, we agree with the trial court that the decision is one which is subject to continuing review by the trial court in order to achieve reunification of the family.

¶ 16 We conclude the record of these proceedings was full and comprehensive, the findings of the Honorable John T. Miller were totally supported by clear and convincing evidence, and there existed and continues to exist a clear necessity to remove B.P. from the family home. To summarize, the Court granted physical and legal custody of B.P. to the grandmother and he cannot reside in the appellants' home until further Order of court. In that the services provided until the date of the final July 17, 2002 hearing were inadequate to maintain the children in the parents' home, the placement with the grandmother was necessary. Moreover, YCCYS is to submit to the court a written list of recommendations to be made in conjunction with the placement and, if approved, the court will incorporate them into the Order (N.T., 7/17/02, at 185).

¶ 17 Order affirmed. The court is directed to implement its Order of July 17, 2002 with modifications as necessary due to the elapse of time since this appeal was perfected.

¶ 18 Jurisdiction relinquished.