J-A12020-15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

IN THE INTEREST OF: K.B., A MINOR   :  IN THE SUPERIOR COURT OF
:        PENNSYLVANIA
:
:
:
:
APPEAL OF: A.B., MOTHER       :  No. 2001 MDA 2014

Appeal from the Order entered November 12, 2014,
Court of Common Pleas, Luzerne County,
Juvenile Division at No. CP-40-DP-0000318-2014

---

IN THE INTEREST OF: E.T., A MINOR   :  IN THE SUPERIOR COURT OF
:        PENNSYLVANIA
:
:
:
:
APPEAL OF: A.B., MOTHER       :  No. 2002 MDA 2014

Appeal from the Order entered November 12, 2014,
Court of Common Pleas, Luzerne County,
Juvenile Division at No. CP-40-DP-0000319-2014

BEFORE: BOWES, DONOHUE and ALLEN, JJ.

MEMORANDUM BY DONOHUE, J.:          **FILED MAY 08, 2015**

Appellant, A.B. ("Mother"), appeals from the orders entered on November 12, 2014 by the Luzerne County Court of Common Pleas regarding her minor children, K.B. and E.T. (collectively, "the Children"). After careful review of the record, we affirm.

A summary of the relevant facts and procedural history is as follows. Mother is the biological mother of K.B. and E.T., who have different biological fathers. K.B.'s biological father, A.C., is incarcerated. At all relevant times, Mother and E.T.'s biological father, L.T., had shared legal

custody of E.T. pursuant to a custody order. Under the custody order, Mother had primary physical custody and L.T. had partial physical custody. Mother and L.T. also had an informal arrangement such that when L.T. had E.T. in his custody, K.B. was also in his custody. The Children both call L.T., "dad."

On June 19, 2014, Mother left her home that she shared with her father ("Maternal Grandfather") and twenty-four-year-old brother ("Maternal Uncle") at approximately 8:00 p.m. to run errands, leaving K.B. and E.T. in the care of Maternal Grandfather. After Mother left the house, Maternal Grandfather, Maternal Uncle, K.B., and E.T. went to the garage to build a bench. At some point, Maternal Grandfather left the garage. Following Maternal Grandfather's departure, Maternal Uncle allegedly sexually assaulted E.T and further physically assaulted K.B. in an attempt to keep her from telling anyone about what she saw. Both K.B. and E.T. ran to Maternal Grandfather and told him what occurred in the garage. Maternal Grandfather immediately called the Pennsylvania State Police. The following morning, Maternal Uncle was arrested based on these allegations.[1]

---

[1] Maternal Uncle fled the home when the state police officers arrived. N.T., 6/23/14, at 25. He returned to the home on June 20, 2014, at approximately 6:30 a.m., at which time, Maternal Grandfather notified the police. *Id.* at 26. The police instructed Maternal Grandfather to hold him at the residence and wait for them to come get him. *Id.* At approximately 5:00 p.m., the police arrived and arrested Maternal Uncle. *Id.*

On the night of the assaults, E.T. was transported to the hospital by ambulance for an examination. Mother met E.T. at the hospital. Following the hospital examination, Mother transported E.T. to the Child Advocacy Center ("CAC") in Scranton for a forensic interview. Mother remained with E.T. at the hospital and at the CAC until she had to go to work, at which time, Mother made arrangements for the Children to stay with her sister.[2]

On June 20, 2014, Luzerne County Children and Youth Services ("CYS") filed a temporary shelter care petition for the Children based on the allegations regarding Maternal Uncle. The trial court granted the petition and transferred temporary legal and physical custody of the Children to CYS. CYS placed the Children in kinship care with L.T. and his girlfriend, B.B. On June 23, 2014, the trial court held a hearing on the continuation of shelter care. The trial court ordered the continued temporary legal and physical custody of the Children with CYS and granted Mother a minimum of eight hours of unsupervised visits with the Children per week. The trial court decided that the Children would remain in L.T. and B.B.'s home for the time being.

---

[2] Mother testified that since Maternal Uncle had absconded, the police did not want the Children to return home and asked if the Children could stay somewhere else until Maternal Uncle was found. N.T., 6/23/14, at 42. Mother agreed, arranging for her sister to care for the Children. *Id.* At some point, however, for reasons unknown to this Court, the Children were transferred to L.T.'s girlfriend, B.B. *Id.* at 42-43.

On June 27, 2014, CYS filed dependency petitions alleging that the Children were without proper parental care and control. CYS claimed that the Children were fearful of returning home and were in need of protection and services. CYS filed amended dependency petitions for the Children on July 29, 2014, further alleging that Mother failed to meet the Children's dental needs and failed to meet E.T.'s mental health needs. On August 4, 2014, the trial court held an adjudication hearing on the dependency petitions, at the conclusion of which the trial court closed the case with regard to E.T., transferring physical custody of E.T. to B.B. until the completion of L.T.'s criminal background check. The trial court found K.B. to be a dependent child and granted CYS temporary legal and physical custody of the child. The court ordered K.B. to be placed in kinship care with B.B., as K.B. already had a kinship relationship with L.T. and B.B. and to prevent separating K.B. from E.T.

On August 14, 2014, Mother filed a motion for reconsideration and a petition for review of visitation. The trial court expressly granted Mother's motion for reconsideration and vacated the August 4, 2014 order. A hearing was held on October 28, 2014, at which all testimony from the June 23, 2014 and August 4, 2014 hearing was incorporated.

On November 12, 2014, the trial court issued an order denying reconsideration of its August 4, 2014 order. With regard to K.B., the trial court found by clear and convincing evidence that K.B. was a dependent

child and transferred custody to L.T. and B.B., with Mother receiving supervised visitation rights. The trial court further found by clear and convincing evidence that E.T. was not a dependent child and transferred physical custody of her to L.T. The trial court granted Mother and Father shared legal custody of E.T. and granted Mother supervised visitation rights. On November 18, 2014, Mother filed a timely notice of appeal to this Court. On appeal, Mother raises the following issues for our review:

> 1. Whether the trial court erred in finding K.B. dependent in light of the undisputed fact that the concerns that led to the filing of shelter care, that removed the [C]hildren from the care of [] Mother, were remedied prior to the time of the adjudication hearing?
>
> 2. Whether the trial court erred in transferring custody of E.T. to [] Father in light of the undisputed fact that the concerns that led to the filing of shelter care, that removed the [C]hildren from the care of [] Mother, were remedied prior to the time of the adjudication hearing?

Mother's Brief at 3.

For her first issue on appeal, Mother asserts that the trial court erred in finding K.B. dependent. Mother's Brief at 12. Mother specifically asserts that the trial court erred because CYS admitted that the safety concerns regarding Mother's ability to protect K.B. that led to the filing of the shelter care petition were remedied prior to the time of the adjudication hearing, and because CYS admitted that Mother and Maternal Grandfather acted appropriately. *Id.*

In addressing this issue, we begin with our well-settled standard of review for dependency cases:

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re E.B.*, 83 A.3d 426, 430-31 (Pa. Super. 2013) (citing *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010)).

Section 6302 of the Juvenile Act defines a "dependent child," in relevant part, as a child who is

> without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals.  A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk.

42 Pa.C.S.A. § 6302(1).

Proper parental care is defined as "care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child." *In re A.B.*, 63 A.3d 345, 349 (Pa. Super. 2013) (quoting *In re C.R.S.*, 696 A.2d 840, 845 (Pa. Super. 1997)).  "The question of whether a child is lacking proper parental care and control so as

- 6 -

to be a dependent child encompasses two discrete questions: whether the child presently is without proper care or control, and if so, whether such care and control are immediately available." *In re C.P.*, 836 A.2d 984, 987 (Pa. Super. 2003) (quoting *In re D.A.*, 801 A.2d 614, 619 (Pa. Super. 2002)).

The petitioner carries the burden of demonstrating by clear and convincing evidence that the child meets the statutory definition of dependency. *In re J.J.*, 69 A.3d 724, 730 (Pa. Super. 2013) (citing *In re J.C.*, 5 A.3d 284, 289 (Pa. Super. 2010)). "'Clear and convincing' evidence has been defined as testimony that is 'so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction without hesitancy, of the truth of the precise facts in issue.'" *In re A.B.*, 63 A.3d at 349 (citing *In re C.R.S.*, 696 A.2d at 843).

In this case, the trial court determined that Mother could not provide proper parental care and control to the Children. Trial Court Opinion, 12/18/14, at 7. The trial court found that "Mother should have insisted that [Maternal Uncle] be on his medication before allowing him to be present around [the C]hildren … [and] should have either required her brother to move out or she should have moved out with the [C]hildren," since Maternal Uncle refused to do so. *Id.* at 9; N.T., 8/14/14, at 67, 75. The trial court found that "[t]he scenario was a figurative ticking time-bomb," and that Mother jeopardized the safety of the Children by allowing Maternal Uncle to have contact with them. Trial Court Opinion, 12/18/14, at 9.

After reviewing the record, we conclude that there is no support in the record for the trial court's conclusions regarding the foreseeability of Maternal Uncle's conduct. To the contrary, both Maternal Grandfather and Mother testified that Maternal Uncle never exhibited sexual behavior towards the Children, became violent towards them,[3] or acted inappropriately towards them. N.T., 6/23/14, at 22, 39-40. They also testified that they did not notice a change in Maternal Uncle's behavior prior to the incident. *Id.* at 29, 40. Furthermore, Mother testified that when she left the Children at the house, she always left the Children in the care of Maternal Grandfather, not Maternal Uncle. *Id.* at 52. Both Maternal Grandfather and Mother testified that the Children were rarely left alone with Maternal Uncle. *Id.* at 22, 52-53. Finally, we note that CYS intake caseworker, Sabrina Pall ("Pall"), testified that Mother and Maternal Grandfather acted appropriately during the incident. *Id.* at 14.

We nevertheless find that the trial court's error in this regard is of minor significance as the trial court seemingly accepted Mother's assertions and CYS' admission on cross-examination that Mother remedied the concerns with regard to Maternal Uncle prior to the dependency hearing.

---

[3] Although Mother and Maternal Grandfather testified that Maternal Uncle was not an aggressive person, they admitted that he was previously involved in two physical altercations with other adults, including one altercation with L.T. N.T., 6/23/14, at 23, 27; N.T., 8/4/14, at 145-46, 160-61. It is a far cry to reach the conclusion, however, that Maternal Uncle's involvement in physical altercations with other adults would put Mother on notice that he would sexually assault or otherwise harm the Children.

*See* Trial Court Opinion, 12/18/14, at 9; N.T., 8/4/14, at 79-81.[4] The trial court's opinion reflects that it did not base its determination that Mother could not provide proper parental care and control on its concerns regarding Maternal Uncle, but instead, rested its determination upon "additional concerns" involving Mother's alleged drug use and Mother's neglect of the Children's dental and mental health needs:

> Mother did not act appropriately during the time frame between shelter care and dependency hearings, specifically in failing to report for requested drug screens. Furthermore, this [c]ourt finds that Mother failed to address E.T.'s mental health needs and the [C]hildren's dental needs which are currently adequately addressed by E.T.'s father, [L.T.]

Trial Court Opinion, 12/18/14, at 19. The trial court determined that these additional concerns evidenced that K.B. was without proper parental care and control when residing with Mother. *Id.* at 7. After our careful review of the record, we conclude that the trial court did not abuse its discretion.

CYS presented evidence supporting its concerns regarding Mother's alleged drug use. Pall testified at the August 4, 2014 dependency hearing that she received a referral that Mother was abusing drugs. N.T., 8/4/14, at 75. Pall testified that she had concerns regarding Mother's drug use and requested that she submit to a urinalysis drug screen prior to having

---

[4] Mother obtained new housing for herself and the Children, which CYS inspected and deemed appropriate. N.T., 8/4/14, at 79. Maternal Grandfather also testified at the shelter care hearing that if Maternal Uncle were released from incarceration, he would not be permitted to return to his home. N.T., 6/23/14, at 20-21.

overnight visits with the Children. *Id.* at 89-90. Despite her phone call to Mother on October 24, 2014, informing her that she needed to submit to a urinalysis drug screen that afternoon, Mother failed to appear for the screen. N.T., 10/28/14, at 27.

At the October 28, 2014 hearing, testimony established that Mother submitted to a drug screen and tested positive for one narcotic substance, Suboxone. *Id.* at 16-17. CYS had not yet obtained records regarding Mother's Suboxone use, however, because Mother did not provide CYS with releases from her doctors until October 20, 2014. *Id.* at 28. Counsel for CYS informed the trial court that CYS had difficulty locating the doctor that prescribed Mother Suboxone because Mother failed to "provide exact information as to the location of the doctor." *Id.* at 28-29. Furthermore, counsel for CYS informed the trial court that CYS obtained results from a previous drug screen from Mother's primary physician, in which Mother tested positive for "several substances that the doctor was not aware of and didn't have information that she was prescribed [those substances]."[5] *Id.* at 26.

CYS also presented evidence that Mother neglected K.B.'s dental needs. Dr. Allen Woods testified that he treated K.B. on April 4, 2013. N.T.,

_____

[5] According to counsel for CYS, Mother submitted to a drug screen in April of 2014. N.T., 10/28/14, at 29. Mother tested positive for "Morphine, [N]oroxycodone, Oxycodone, Alprazolam, Oxymorphone, and then another medication that were not listed on any requisition." *Id.*

8/4/14, at 58. At that time, K.B. had three cavities; one in a baby tooth, and two in her adult teeth. *Id.* at 58-59. K.B. had an appointment scheduled for April 25, 2013 to have further work completed, but K.B. did not come to the appointment. *Id.* at 59.

Dr. Shawn Casey testified that he examined and treated K.B. on June 24, 2014 when "she came in with an emergency problem." *Id.* at 46-47. Dr. Casey testified that K.B. required two fillings on two of her adult teeth and had one baby tooth extracted that was decayed and nonrestorable. *Id.* at 46-48. Dr. Casey testified that the decay of the tooth was extensive and that there was "a little bit of infection" in the tissue around the tooth.[6] *Id.* at 47, 49, 51. Dr. Casey also testified that K.B. experienced some discomfort from the tooth that had to be extracted. *Id.* at 46-47. According to Dr. Casey, K.B.'s discomfort most likely came from the decay of the tooth, but he admitted that it could have been caused by the pressure from the permanent tooth that was coming in immediately underneath it, or from a

---

[6] Dr. Casey testified that a ruptured abscess could cause the infection. N.T., 8/4/14, at 49. Dr. Casey also testified that L.T.'s girlfriend, B.B., provided a medical history and described that K.B. had an abscess on that tooth, which is the reason why she came to the office for treatment. *Id.* at 48-49. Pall testified that K.B. informed her that she previously told Mother she had a "bubble" on her tooth and that she was experiencing pain. N.T., 8/4/14, at 68-69. According to Pall, Mother's friend's mother "popped said bubble." *Id.* Mother contested this information and asserted that K.B. "did not address the problem to [her]," and that she just recently learned of this information. *Id.* at 125-26. The trial court, however, did not find Mother credible, choosing instead to believe Pall's testimony on this issue. *See* Trial Court Opinion, 12/18/14, at 13.

combination of the decay and the pressure from the permanent tooth. **Id.** at 46-47, 52.

Mother attempted to provide an explanation for the lack of dental care, testifying that she did not follow up with Dr. Woods because L.T., who provided dental insurance to the Children, "dropped their insurance" when he quit his job. **Id.** at 113-14. When questioned, Mother admitted that she never called the insurance company to determine whether the Children had coverage. **Id.** at 128. Mother, however, applied for and received welfare assistance, including a medical ACCESS card, after she learned that the Children's insurance was cancelled. **Id.** at 117-18. Mother did not return to Dr. Woods, however, because he did not accept the ACCESS card. **Id.** at 118. Furthermore, Mother testified that the Children did not complain of any pain and that she did not receive any reports from L.T. that the Children complained of pain, and therefore, did not see "a major issue that needed to be prompted [sic] immediately." **Id.** at 118, 122-125.

The trial court did not find Mother credible, stating, "The court finds Mother's testimony to be inconsistent with respect to whether she was told the health insurance was actually cancelled or whether she assumed it was cancelled at the time her second appointment was scheduled with Dr. Woods in April of 2013." Trial Court Opinion, 12/18/14, at 14. The trial court also deemed credible L.T.'s testimony that the Children complained about dental pain. **Id.**

As the trial court is the sole arbiter of the credibility of witnesses, we are unable to find that the trial court abused its discretion. *See Busse v. Busse*, 921 A.2d 1248, 1255 (Pa. Super. 2007) ("The fact-finder is in the best position to assess credibility of witnesses and we do not disturb credibility determinations on appeal."). Furthermore, "we are not in a position to reweigh the evidence and credibility determinations of the trial court[,]" even if the opposite conclusion could be reached. *In re R.J.T.*, 9 A.3d at 1190. In this case, the record contains evidence establishing Mother's inability to provide proper care or control necessary for K.B.'s physical health. CYS also established a concern that Mother's substance abuse threatened the health, safety, and welfare of K.B.[7] Accordingly, we conclude that the record supports the trial court's determination. The trial court did not abuse its discretion in adjudicating K.B. dependent.

For her second issue on appeal, Mother argues that the trial court erred in transferring custody of E.T. to L.T. since she remedied the conditions that led to the filing of the shelter care petition prior to the time of the adjudication hearing. Mother's Brief at 16. Mother asserts that the trial court erred in relying on the principles of *In the Interest of Justin S.*,

---

[7] This Court has established that evidence of a parent's use of alcohol or a controlled substance is a proper consideration in determining whether parental care and control is immediately available. *In re J.J.*, 69 A.3d at 731; *see also* 42 Pa.C.S.A. § 6302(1).

543 A.2d 1192 (Pa. Super. 1988), as that case is distinguishable from the case herein. Mother's Brief at 16.

In *In the Interest of Justin S.*, a trial court altered an existing custody arrangement between a divorced mother and father by awarding custody to the father without first adjudicating their two children dependent. *In the Interest of Justin S.*, 543 A.2d at 1200. Prior to the trial court's decision, the mother had custody of the children. The trial court determined, however, that the mother could not provide her two children with proper parental care and control, while the father of the children could immediately provide the children with such care. *Id.* On appeal to this Court, mother argued that the trial court erred in awarding custody to father without first adjudicating the children dependent. *Id.*

This Court held that "in a dependency proceeding, a court may grant custody of an allegedly dependent child to that child's non-custodial natural parent without first declaring the child dependent as long as sufficient evidence of dependency exists." *Id.* at 1199. We further found that, in general, "any attempted disposition of the custody of an infant in a dependency proceeding is improper where the record indicates no finding of dependency was ever made." *Id.* at 1187. "[A] court cannot adjudge a child to be dependent when his non-custodial parent is ready, willing, and able to provide the child with proper parental care and control[.]" *Id.* at 1191. Thus, we concluded:

> It is the duty of the trial court to determine whether the noncustodial parent is capable and willing to render proper parental care and control prior to adjudicating a child dependent. **If the court determines that the custodial parent is unable to provide proper parental care and control 'at this moment' and that the non-custodial parent is 'immediately available' to provide such care, the child is not dependent under the provisions of the Juvenile Act. Consequently, the court must grant custody of the allegedly dependent child to the non-custodial parent.**

*Id.* (emphasis added).

Mother asserts that *In the Interest of Justin S.* is inapplicable because CYS did not meet its burden of proof for dependency in this case, and therefore, the Children should be returned to her. *Id.* at 16. We disagree.

As previously discussed, CYS presented evidence establishing a concern regarding Mother's alleged drug use. With respect to E.T.'s health and safety in particular, CYS presented evidence that as with K.B., Mother neglected E.T.'s dental needs. Dr. Woods treated E.T. on April 4, 2013, and discovered that E.T. had five cavities. N.T., 8/4/14, at 58, 60. Dr. Woods referred E.T. to a pedodontist to have two pulpotomies (root canals on baby teeth) conducted, as the cavities had reached the middle of the tooth where the nerve is located. *Id.* at 60-61. Mother did not follow up with the pedodontist or pursue any additional treatment despite Dr. Woods' referral.

Another dentist, Dr. Leigh Jacopetti, testified that she treated E.T. on June 23, 2014. E.T. did not report any pain at that time, but Dr. Jacopetti filled a cavity in one of E.T.'s permanent molars and extracted two baby teeth. *Id.* at 37, 39. Dr. Jacopetti testified that E.T. needed three additional fillings, including one tooth, which needed a pulpotomy. *Id.* at 38. Given E.T.'s young age, however, Dr. Jacopetti testified that the additional work had to be scheduled for a future date "because it's too much for [young children] to sit through in one visit." *Id.* at 41.

CYS also presented evidence that Mother failed to follow recommendations with regard to E.T.'s mental health needs. Because E.T. exhibited problems at school both socially and academically, E.T.'s school recommended that Mother seek treatment for E.T. *Id.* at 114. Mother chose to take E.T. to Northeast Counseling since they accepted the ACCESS card. *Id.* at 158. A psychiatrist at Northeast Counseling diagnosed E.T. with social phobia and determined that E.T. required further evaluation to determine if she had Attention Deficit Disorder. N.T., 8/4/14, at 24. Janice Wile Judge ("Ms. Judge"), the program director of the children's outpatient department at Northeast Counseling, testified that Mother and E.T. attended two therapy sessions with the psychiatrist, but failed to attend a third session, and thereafter failed to respond to any letters sent by Ms. Judge or Northeast Counseling. *Id.* at 25-27.

Mother testified that she stopped attending sessions at Northeast Counseling because they wanted to medicate E.T. *Id.* at 140. L.T. testified that he attended the session at Northeast Counseling when they discussed recommendations for E.T. and that they never discussed medicating E.T. *Id.* at 169-70. The trial court found that Mother's testimony lacked credibility. Trial Court Opinion, 12/18/14, at 12-13.

Mother further testified that she did not engage any other services or agencies to treat E.T.'s mental health needs because E.T. had shown significant improvement without outside intervention. N.T., 8/4/14, at 141-42. Mother asserted that in two months she helped E.T. bring her grades up "from [fifties] to straight A's [sic]," *Id.* at 115, and that E.T.'s mental health needs were being met by the school's counseling services and her individualized education plan ("IEP"). *See id.* at 114-17. Mother and CYS stipulated, however, that an IEP draft report showed that E.T. had a thirty-three in spelling. *Id.* at 133-39.

We once again reiterate that "[w]e must defer to the factual findings of the hearing judge and accord them great weight as he has had an opportunity to observe and rule upon the credibility of the witnesses and parties who have appeared before him." *In the Interest of Justin S.*, 543 A.2d at 1198. In this case, the record reveals evidence to support the trial court's determination that Mother neglected E.T.'s dental and mental health needs, and that Mother had drug concerns. Thus, contrary to Mother's

assertion, we do not find *In the Interest of Justin S.* to be distinguishable, as CYS demonstrated that Mother could not provide proper parental care and control for the Children.

Mother further asserts that unlike the father in *In the Interest of Justin S.*, which the trial court in that case deemed immediately available to provide proper parental care and control, L.T. was not "a fit and willing resource for the court to consider." *Id.* at 17. Mother states that L.T. had the same failings as she did with regard to the dental needs and mental health of the Children and that "it is illogical to hold [Mother] accountable but not dad when he had the [C]hildren [twenty] of the days the month preceding shelter care." *Id.*

The trial court specifically rejected Mother's assertion, stating, "This [c]ourt disagrees with Mother's argument that [L.T.] failed to take the child [(E.T.)] and her half-sibling [(K.B.)] to dental appointments or to counseling appointments." Trial Court Opinion, 12/18/14, at 17. The trial court found credible L.T.'s testimony and Pall's testimony that L.T. attempted to address the Children's dental needs by discussing the issue with Mother.[8] *Id.* The trial court also accepted the testimony and stipulations by Mother and L.T. that L.T. could not schedule appointments for counseling to address E.T.'s mental health needs because Mother would not let him see the Children for a

---

[8] We note that since L.T. gained custody of the Children, L.T. and B.B. have addressed the dental needs of the Children. *See* N.T., 8/4/14, at 165-66, 170.

- 18 -

period of time, evidenced by the three custody contempt petitions L.T. filed against Mother. *Id.* at 17-18. As credibility determinations are left to the trial court, we do not disturb the trial court's findings in this regard. *See Busse*, 921 A.2d at 1255.

As a result, we conclude that pursuant to *In the Interest of Justin S.*, the trial court was required to grant custody of E.T. to L.T. since L.T., the noncustodial parent, was available to provide E.T. with proper parental care and control. Accordingly, the trial court did not err in transferring custody of E.T. to L.T.

Orders affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/8/2015

- 19 -