J-S38031-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: E.S., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1092 EDA 2022 |

Appeal from the Order Entered April 6, 2022,
in the Court of Common Pleas of Philadelphia County,
Juvenile Division at No(s):  CP-51-DP-0000248-2018.

BEFORE:  KUNSELMAN, J., MURRAY, J., and SULLIVAN, J.

MEMORANDUM BY KUNSELMAN, J.:              **FILED JANUARY 10, 2023**

J.B. (Father) appeals the dependency adjudication of his 12-year-old daughter E.S. (the Child), pursuant to the Juvenile Act. *See* 42 Pa.C.S.A. § 6302.  Father argues the Juvenile Division of Philadelphia County Court of Common Pleas erred when it determined that the Department of Human Services (DHS) met its evidentiary burden.  After review, we affirm the adjudicatory order.

The relevant factual and procedural history is as follows.  The Child was born in 2009.  The Philadelphia Department of Human Services (DHS) first became aware of the family in 2018 following allegations of Mother's drug use. In February 2018, DHS obtained an order of protective custody, and in March 2018, the juvenile court adjudicated the Child dependent.  From the time of the Child's birth until the 2018 dependency case, Mother exercised primary

physical custody of the Child subject to Father's partial custody, which he exercised on alternating weekends. In September 2018, the court discharged the dependency matter and awarded Father with primary custody.

In its Pa.R.A.P. 1925(a) opinion, the court noted that it was unclear where the Child resided following the closure of the dependency case. The testimony indicated that the Child resided with Father, Mother, and Paternal Grandmother at various times throughout the rest of 2018. Moreover, the Child had not seen Father in person since early 2020, before the onset of the COVID-19 pandemic. **See** Trial Court Opinion, 5/18/22, (T.C.O.), at 2-3, n.2.

On December 31, 2020, the family again came to the attention of DHS. The police went to Mother's home on a welfare visit, because the Child had not been attending school. Mother was uncooperative and refused to speak with police. Mother was hospitalized for involuntary mental health treatment, and the Child was placed in the care of Paternal Grandmother. In February 2021, DHS received a report that the Child was afraid of Mother and refused to return to her care. The report alleged that Father was not involved in the Child's care, and that he now resided in St. Louis, Missouri. DHS was concerned with Mother's severe mental health issues.

By November 2021, Mother received primary custody of the Child. On November 12, 2021, Mother attempted to retrieve the Child from Paternal Grandmother's home, but the Child refused to leave. DHS obtained an order for protective custody, and the court placed the Child in the home of Paternal Aunt. After the shelter care hearing, the court ordered that Father was

permitted to have supervised visits at the discretion of Paternal Aunt. Between February 2021 (when DHS became involved with the family again) and December 2021 (when DHS filed its second dependency petition), DHS did not know where Father was, only that he was not involved in the Child's care, and that he did not respond to their inquiries.

The juvenile court conducted its dependency hearing over the course of two dates: March 3 and April 6, 2022. On the first day, the juvenile court heard the testimony of the Community Umbrella Agency (CUA) case manager assigned to the family. The case manager was involved with the family since February 2021. She explained that she had tried to reach Father since that time, but he ignored her calls and said he would speak to his attorney. The case manager was not able to speak to Father until January 2022. The Child told the case manager that she did not want to live with Father, because she did not know him and did not want to move to St. Louis. The case manager reported that the Child had not had any in person contact with Father since 2020. Still, the case manager explored reunification with Father, but Father did not respond to her inquiries.

The juvenile court had directed CUA to refer Father for an Interstate Compact on the Placement of Children (ICPC). The ICPC was not completed, because the case manager could not obtain necessary information from Father. The Child was willing to have phone contact with Father and had spoken to Father two or three times in February 2022. On cross-examination

by the Child's advocate, the case manager said that the Child is happy with Paternal Aunt and wishes to remain there.

Father, who appeared remotely, testified that he moved to Missouri after losing his job during the COVID-19 pandemic. He said he had a great relationship with the Child and spoke to her by phone every day while she was residing with Paternal Grandmother. Father said he lived with his fiancée and his son in Missouri and wished for the Child to join him. Father conceded that in 2021, he was not aware of who was caring for the Child and that he did not return to Philadelphia to check on the Child or inquire about her whereabouts.

At the conclusion of the hearing's first day, the juvenile court deferred adjudication. The court ordered Father to complete clearances for himself as well as any household members. The court also ordered the case manager to follow up with local children services in Missouri to see if the local agency could conduct a home assessment. Finally, the court ordered Father to have virtual visits with the Child, or in-person visits as arranged by Paternal Aunt.

On the second day of the hearing, a month later, the case manager testified that Father's clearance report revealed no prohibitive offenses in Pennsylvania and no criminal record in Missouri. However, Father did not provide the necessary clearances for his fiancée. The local agency in Missouri purportedly did not do a home assessment, because the Child did not reside in Missouri. Still, the case manager conducted a virtual home assessment and found the home to be appropriate. But Father did not provide the case

manager with a lease, and she was unable to verify whether the home Father showed her during the virtual assessment was actually Father's home.

The juvenile court also heard testimony that Father had screamed at the Child during his virtual visits and called the Child "dumb" or "stupid." The Child also reported crying during the visits, because Father had been screaming and using profanity at her. The case manager testified that Paternal Aunt confirmed Father's behavior, and also said Father acted belligerently toward Paternal Grandmother. The case manager said that, based on what occurred during the visits, she did not feel that the Child would be safe in Father's care. She further testified that the Child was fearful of Father. The case manager also testified that she had concerns with Father's anger management and decision-making skills. Father denied yelling at the Child, and testified that he and Paternal Aunt never had a close relationship.

Following the second day of the hearing, the juvenile court adjudicated the Child dependent and ordered that the Child remain with Paternal Aunt. The court also ordered Father to cooperate with CUA and provide them with any necessary information. The court referred Father for parenting and anger management classes.

Father timely filed this appeal. He presents the following issue for our review:

> Did DHS sustain the burden that the Child should be adjudicated dependent?

Father's Brief at 9.

"The standard of review in dependency cases requires an appellate court to accept findings of fact and credibility determinations of the trial court if they are support by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. We review for abuse of discretion." *In re L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015) (citation omitted).

Interpretation of the Juvenile Act must be done to effectuate its underlying purpose: "to preserve the unity of the family whenever possible or to provide another alternative permanent family when the unity of the family cannot be maintained"; and "to provide for the care, protection, safety and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa.C.S.A. § 6301(b)(1), (1.1).

The Juvenile Act defines a dependent child as, *inter alia*, a child who:

> (1)  is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his [or her] physical, mental, or emotional health or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk […].

42 Pa.C.S.A. § 6302.

"The question of whether a child is lacking proper parental care and control so as to be a dependent child encompasses two discrete questions: whether the child presently is without proper care or control, and if so,

- 6 -

whether such care and control are immediately available." ***In re C.P.***, 836 A.2d 984, 987 (Pa. Super. 2003).

The question before us is whether DHS proved the Child was dependent by clear and convincing evidence. "Clear and convincing evidence" requires:

> That the witnesses must be found to be credible; that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order; and that their testimony is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. It is not necessary that the evidence be uncontradicted provided it carries a clear conviction to the mind or carries a clear conviction of its truth.

***In Interest of J.M.***, 166 A.3d 408, 424 (Pa. Super. 2017) (quoting ***In re Novosielski***, 992 A.2d 89, 107 (Pa. 2010)).

Instantly, Father presents a narrow argument. He maintains that DHS did not meet its evidentiary burden, because Father was "ready, willing and able" to parent the Child. ***See*** Father's Brief at 13. He explains that there was no evidence he neglected the Child, that he passed his clearances, and that his home was deemed appropriate. ***Id.*** at 15-16. Father concludes that because he is immediately available to care for the Child, the juvenile court's decision was erroneous.

In is Rule 1925(a) opinion, the juvenile court explained that it had concerns with Father's living arrangement, notwithstanding his clearances and the virtual home assessment. The court was troubled by the fact that Father was uncooperative with CUA in the year leading up to the dependency petition.

And while he complied with his clearances, he did not ensure that his fiancée did the same. And because Father did not provide a lease, CUA could not be sure that home that Father showed the case manager in the virtual assessment was his actual home. *See* T.C.O. at 11.

If this was the sole basis for the juvenile court's dependency adjudication, perhaps we might have doubt that DHS met the clear and convincing evidentiary standard, especially since the local Missouri agency could not conduct a home assessment without a formal ICPC request. It is unclear whether CUA abided by the court's directive and followed the ICPC process, or whether the failure was due to some agency bureaucracy. In either event, the fault does not appear to be that of Father's.

Critically, however, Father's living arrangement was not the basis for the juvenile court's decision. The court was more alarmed by the case manager's testimony regarding Father's conduct during the visits with the Child. When the court ordered virtual visitation between its hearing dates, the Child had not seen Father in approximately two years. Although he had spoken to the Child the previous month, the Child told the case manager that she barely knows him. *Id.* at 12. During the visits, Father accosted the Child, called her names, used profanity, and caused the Child to be fearful. *Id.* at 11-12. Based on the case manager's testimony, the juvenile court ultimately determined that the Child was without proper parental care and that such care was not immediately available.

Father does not address the juvenile court's concern with his behavior. His silence is notable, considering that his behavior was evidently the principal reason for the court's decision. DHS, by contrast, argues that the court's focus on Father's behavior was in line with our precedents.

DHS cites our decision in **In re C.P.**, 836 A.2d 984 (Pa. Super. 2003) for the proposition that a child's fear of mental abuse is sufficient to support an adjudication of dependency. **See** DHS's Brief at 13. In **C.P.**, the children were adjudicated dependent after the lower court heard evidence that they were diagnosed with post-traumatic stress disorder following the father's mental and physical abuse. **C.P.** 836 A.2d at 988.

DHS also cites on our decision in **In re S.M.**, 614 A.2d 312 (Pa. Super. 1992) for the proposition that that a parent's poor discipline and the child's deteriorating relationship with the parent is a sufficient basis for an adjudication of dependency. **See** DHS's Brief at 13-14. There, the local agency became concerned after the child was acting out in school. The court heard testimony that the child had told the school psychologist that his home life was unbearable. **S.M.**, 614 A.2d at 313-14. Additionally, the court heard testimony that the child's rib was fractured after the father hit him.

Neither **C.P.**, nor **S.M.** fits perfectly here; both precedents involve physical abuse in addition to mental abuse. But these cases are helpful insofar as they recognize that the Juvenile Act's definition of proper care includes care necessary for the child's mental or emotional health. **See also** 42 Pa.C.S.A. § 6302 (defining a dependent child as one "is without proper parental care or

control, subsistence, education as required by law, or other care or control necessary for his [or her] physical, mental, or emotional health or morals."). Indeed, one purpose of the Juvenile Act is to ensure child are provided care for their mental development. 42 Pa.C.S.A. § 6301(b)(1); *cf.* (1.1).

Here, it was evident that the juvenile court was primarily concerned with the Child's mental health.[1] Although the court's concern was based primarily on the incidents involving the virtual visits, we do not find such evidence to be *per se* insufficient.

For instance, in *In re R.W.J.*, 826 A.2d 10, 14 (Pa. Super. 2003), this Court held that "a finding of dependency can be made on the basis of prognostic evidence and such evidence is sufficient to meet the strict burden of proof necessary to declare a child dependent." *Id.* (citing *In Interest of Black*, 417 A.2d 1178 (Pa. Super. 1980) (holding prognostic evidence sufficient for finding of dependency of newborn infant where parent's two previous children died because of parent's improper care and failure to take necessary precautions).

In *R.W.J.*, the father had previously pleaded guilty to involuntary manslaughter of another child, and the mother had a history of severe drug abuse. *R.W.J.*, 826 A.2d at 13. Based on their past conduct, the lower court

---

[1] Still, it cannot be left unsaid that the juvenile court had at least some concern for the Child's physical safety, considering that Father could not verify the suitability of his living arrangement and considering that there were times Father had been so uninvolved in the Child's life, he was unaware of where she lived or who was caring for her.

- 10 -

determined that the child was without immediate parental care. In other words, courts may rely on evidence of past conduct to determine whether parental care is immediately available going forward. To that end, we note that such conduct includes both actions and the failure to act. "[W]hen determining whether a parent is providing a minor with proper care and control, the caretaker's acts and omissions should weigh equally." *Id.* at 14 (citation omitted).

In this case, Father had limited involvement with the Child prior to her first dependency case in 2018. After that dependency case was closed, Father obtained primary custody. But then at some point, Father stopped exercising custody and admitted that he did not always know where the Child was or who cared for the Child. After the Child came to the attention to DHS for a second time in February 2021, Father failed to cooperate with the agency for nearly a year, necessitating a second dependency petition. After that second petition was filed, Father still failed to completely cooperate with the agency regarding the fiancée's clearances. This caused both the court and DHS to be concerned with the suitability of his home. Finally, Father accosted the Child during their visits, notwithstanding the fact that they had not seen each other in years.

The juvenile court ascertained these facts from testimony it deemed credible. The court reached its decision by considering Father's prior conduct, including his prior acts and omissions. Based on this conduct, the court determined that the Child's health and safety were at risk. Upon our review, we conclude the juvenile court did not err or abuse its discretion when it

determined that DHS sustained its burden of proof that the Child was dependent.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/10/2023