J-S59015-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF:  D.C., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  D.C., FATHER | No. 3624 EDA 2015 |

Appeal from the Order Entered November 5, 2015
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s):
CP-51-DP-0001815-2015
FID:  51-FN-1533-2015

BEFORE:  BENDER, P.J.E., OLSON, J., and FITZGERALD, J.[*]

MEMORANDUM BY BENDER, P.J.E.:          **FILED SEPTEMBER 22, 2016**

D.C. (Father) appeals from the November 5, 2015 order that adjudicated D.C. (Child)[1] dependent, that ordered Child removed from C.H.'s (Mother) home with legal custody transferred to the Philadelphia Department of Human Services (DHS), that directed Child was to be placed in kinship care, and that found child abuse was established.[2]  After careful review, we affirm.

---

[*] Former Justice specially assigned to the Superior Court.

[1] Child was born in October of 2014.

[2] We note that the trial court references the Child Protective Services Law, 23 Pa.C.S. § 6303, and identifies a definition of "child abuse."  **See** Trial Court Opinion, 3/24/16, at 12.  That section was amended and became effective as of December 31, 2014, and applies to the present case. Although the court's citation references the pre-amendment definition, the court's findings and analysis comport with the post-amended language and Father's actions here fall within the revised definition.  **See** 23 Pa.C.S. § 6303(.1)(8)(i).

Father filed a timely appeal and a statement of matters complained of on appeal. In his brief, Father states his questions as follows:

1) Whether the evidence was sufficient in making a finding of child abuse[?]

2) Whether the evidence was sufficient in adjudicating Child dependent[?]

3) Whether the evidence was sufficient to sustain placement into agency custody[?]

Father's brief at 5.

Our scope and standard of review in dependency cases is as follows:

We must accept the facts as found by the trial court unless they are not supported by the record. Although bound by the facts, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate. We review for abuse of discretion. Our scope of review, accordingly, is of the broadest possible nature. It is this Court's responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Nevertheless, we accord great weight to the court's fact-finding function because the court is in the best position to observe and rule on the credibility of the parties and witnesses.

*In the Interest of A.N.*, 39 A.3d 326, 330 (Pa. Super. 2012) (quoting *In re C.M.T.*, 861 A.2d 348, 351 (Pa. Super. 2004) (citations omitted)).

We have reviewed the certified record, the briefs of the parties, the applicable law, and the thorough, well-written 13-page opinion authored by the Honorable Vincent L. Johnson of the Court of Common Pleas of Philadelphia County, dated March 24, 2016. We conclude that Judge

- 2 -

Johnson's extensive opinion accurately disposes of the issues presented by Father on appeal and we discern no abuse of discretion or error of law. Accordingly, we adopt Judge Johnson's opinion as our own and affirm the November 5, 2015 order on that basis.

Order affirmed.

Fitzgerald, J., joins this decision.

Olson, J., concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/22/2016

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FAMILY COURT DIVISION
JUVENILE BRANCH

In The Interest Of:  :  CP-51-DP-0001815-2015
D.C.  :
Minors  :
  :  FID: 51-FN-1533-2015
  :
Appeal of D.C., Father  :  3624 EDA 2015

## OPINION

This Opinion is submitted relative to the appeal of D.C. ("Father") from this Court's

Order dated November 5, 2015, which adjudicated D.C (the "Child"), dependent. For the reasons

discussed, this Court respectfully submits that its decision should be affirmed.

## Background

On April 18, 2015, the Department of Human Services ("DHS") received a Child

Protective Services Report ("CPS") alleging that the Child's parents, C.H. ("Mother") and

Father, took the Child to St Christopher's Hospital for Children because the Child was

experiencing discomfort in his left arm; Father stated that the Child was falling from the bed, and

he grabbed the Child by his left arm to prevent him from hitting the floor. An X-ray revealed that

the Child sustained a fracture to his left arm, however, the injuries were not serious. The report

was indicated.

On the same day, DHS visited the family's home and implemented a safety plan in which

Father would not reside in the home until DHS completed the investigation of the CPS report.

The Child's maternal grandmother was listed as the person to supervise the Child and ensure that

his basic daily needs were met.

1

On May 18, 2015, DHS received the May 11, 2015 x-ray results and learned that there were no additional injuries or healing injuries detected.

On June 25, 2015, Father was informed by DHS, via telephone, that the CPS report was indicated and that the case was open for services. Father refused DHS services and terminated the call.

On November 5, 2015, an adjudication hearing was held. During this hearing, the Court heard the testimony of Doctor Maria McColgan (Pediatrician at St. Christopher's Hospital), Christopher Lee (DHS Social Worker), Kenisha Brown (CUA caseworker), Father and David Hamilton (maternal uncle).

Dr. McColgan testified that she became involved in the case on or around May 18, 2014 after being contacted by the Emergency Department ("ER") at St. Christopher's regarding the Child's injury. N.T. 11/5/15 at 9. An X-ray showed that the child had a fracture of his left arm at "the mid portion of his hum[erus]. The hum[erus] is the bone of the upper arm and he had a fracture through and through the hum[erus]" Id. at 10-11. The Child was five months[1] old at the time of his injury. Id. at 12.

Dr. McColgan also stated that:

> In a non-ambulatory child where the child didn't cause the injury himself that of course makes us think about the possibility of could child abuse have occurred. The fracture is a pretty significant fracture, as you can see it goes through the bone of his arm so it would have required a significant amount of force...It's not something that you would see with routine care of an infant, but, again, pulling or yanking a child of this they're falling is not routine care either...There is no reason to believe he had medical bone disease or something wrong with his bones to lead to his bones to break more easily that another five month old male.

Id. at 14-15. The Child was later x-rayed on May 11, 2015, and the Child's fracture was healing properly in his cast, however, the level of pain for the fracture would have been severe. Id. at 20.

---

[1] The Child was almost nineteen pounds, in the ninety eighth percentile for his weight. Id. at 27.

2

After a review of the Child's records, Dr. McColgan indicated that Father caught the Child as he was falling off the bed by his arm right before the Child hit the ground. Id. at 28-29. When commenting on Father's account of what happened to the Child, Dr. McColgan stated; "[I]ts not impossible that it happened that way." Id. at 30.

At the conclusion of Dr. McColgan's testimony, she stated that the Child's injuries:

> Are inflicted injuries. The child didn't cause them themselves, but as far as whether or not it happened the way father is reporting. I don't know that I could say definitely one way or the other. I think it's possible that it happened that way, but I do again think that it would require a fair amount of force. You would have yanked pretty hard in order for this to happen. And so I could imagine it happening in the state of panic as the child is rolling off the bed. But, again, it raised significant concern.

Id. at 33-34, 37.

Next, based on the CPS report and his investigation of the parents, Mr. Lee testified on the potential of "creating a reasonable likelihood of bodily injury." On April 20, 2015, DHS implemented a safety plan which involved Father moving out of the residence of the Child[2], not returning and having no contact with the Child until after DHS has completed its investigation. Id. at 66. Father was also told that he could not see his son by himself. Id. at 141. Father subsequently moved on Fernhill Road. Id. at 141. There was a Facebook video after the safety plan was implemented showing Father in the residence with Mother, the Child and the maternal grandmother. Id. at 64-66. This post gave Mr. Lee concerns about Mother's protective capacities. Id. at 66. In particular, there were concerns of "assuring that [Father]…does not return in the home and have contact with the child until our case is completed[3]. Id. The factors Mr. Lee considered in his evaluation were Father's "behavior at every turn, at my phone calls, voicemails being left at the last couple of preliminary hearings…" Id. at 66-67.

---

[2] Father claims that he did not know he was not allowed to visit with the Child without supervision, because he believed that Ms. Hamilton's supervision was sufficient. Id. at 125, 133, 140-41.

[3] They still had not completed the DHS evaluation of the Child's injury. Id. at 66.

3

On April 28, 2015, DHS received an inflammatory voicemail from Father which was its first contact with Father since discussing the safety plan on April 20, 2015. Id. at 52. On the voicemail[4], Father stated: "Real [s***], homie. You take your job too seriously. I would hurt my son[?][5] I feel any type of any way I feel I can do whatever the [f***] I want. Who do you think you are? You can eat [s***]. I can feel anyway the [f***] I feel." Id. at 57-58. After this conversation, DHS implemented In-Home Protective Services ("IHPS") in the home. Id. at 58.

On June 25th 2015, the DHS worker had a conversation with Father. Id. at 44. Mr. Lee stated that he was originally calling to inform Father that he could return to the home with the Child and Mother. After Mr. Lee's conversation with Father, an urgent petition was filed with the Court. During the conversation, Mr. Lee stated that:

> I was trying to explain to father, you know, the steps we're taking, father began yelling. He was irate on the phone with me. Father stated that DHS cannot tell him what to do, what he can't do. Father stated, "DHS has no right..." Every step that I tried to explain to him [Father] that we're implementing services in the home and that you're allowed to return home, I couldn't even get that across. And that's as simple as I can explain it. "F'n gooks," became irate. At that point I hung up the phone.

Id. at 59-60.

On July 16, 2015, after Father's violation of the safety plan, Father's visits were changed to supervised line of sight visits at DHS[6].

Ms. Brown was then called to testify about her observations of the visits between the Child and the parents. Id. at 93. During one of Father's visits, Ms. Brown testified that she had concerns about Father's judgment with regard to the Child. Id. In particular, she stated: "if you're carrying your baby and you're upset, I'm concerned. You're saying very demeaning things to

---

[4] Mr. Lee wrote out the contents of the voicemail and read it into the record, because he did not have the recording 'on hand. Id. at 54.
[5] The statement was a question and not an affirmative statement of abuse. Id. at 72.
[6] See Court's Exhibit A (Continuance Order).

people. You're yelling in a forceful tone and you're carrying your eleven, twelve month old baby." Id. at 102. After the incident with Father, his visits were suspended. Id.

Father testified at the adjudicatory hearing that:

> I turned around for like one quick second just to plug in my Play Station 4. He [the Child] got his little toes, he fallen backwards and right before he hit the ground I grabbed right there by his arm [the middle of his arms]. I throw him up. And I told him [Mr. Lee] that… It wasn't a scoop on the bed. It was in the air so like as he's about to hit the ground, I picked him up and threw him in the air[7] just like that… I've been doing that since my son's been about three months, four months…that was our little joyous time. Like I make him laugh.

Id. at 116, 118-20. When Father had the child back in his hands, the Child was crying, but Father thought the Child was "crying because he was startled" from being thrown in the air. Id. at 120-21. When Father would throw the Child in the air with Mother present, she would tell him to "Stop" or "You're going to hurt his stomach because he's eating." Id. at 133. On each occurrence where Mother saw Father throw the Child in the air, "she gets angry with me and stuff like that…In her presence I don't do it because me and her, that causes an argument." Id.

Father then admitted "I'm guilty of neglect for turning my back" on the infant. Id. at 123. It should be noted that this is Father's first and only child. Id. at 123, 132.

Father also stated that when he left the message on Mr. Lee's phone, he was upset about losing his job at Vision Quest[8] as a result of DHS finding Father guilty of child abuse. Id. at 123-25. Immediately before the Child fell from the bed, Father was leaning over the bedroom television to set up his PlayStation4. Id. at 134-39.

---

[7] "Indicating for the record that father is raising his hands above his head in a throwing motion and releasing his fingers… [the Child would be] about five inches [away from Father's face]". Id. at 120.

[8] It should be noted that Vision Quest hired Father despite his criminal record. Id. at 122. See also Exhibit B (Father's Criminal Abstract which was admitted into the record. Id. at 61,112.

5

Then Mr. Hamilton[9] was called to testify about the relationship of the parents with the Child prior to DHS involvement. Id. at 149. Mr. Hamilton testified that Father was always attentive to the Child and that he would not harm the Child intentionally. Id. at 150. He also stated that Father has an anger problem but not directed towards the Child. Id. at 151. Mr. Hamilton has never seen Father throw the Child in the air during any of his encounters with the Father and the Child. Id. at 152.

After closing arguments, the Court made the following findings as to the credibility of the witnesses: 1) Doctor McColgan was credible and her testimony accepted in full; 2) Ms. Brown was credible and her testimony accepted in full; 3) Mr. Cummings was credible and his testimony accepted in full; 4) Father was credible and his testimony accepted in full, "including all admissions of negligence and lack of supervision made by him." Id. at 167-68.

The Court noted that Dr. McColgan:

> could not to a reasonable degree of medical certainty indicate that the break [left humerus] that took place in the young child was child abuse…So the Court cannot find child abuse by clear and convincing evidence. And the court [would] be wrongful and negligent if in that instance [broken arm] it found child abuse… However, unfortunately, clients and testimony does take a life of its own. Clearly the law with regard to what a dependent child is, with regard to present inability, a dependent child is one without proper parental control, care, control. More importantly, when you look at the statute further where the caregiver, parent or guardian places the health, safety, welfare of the child at risk, clearly this child was at risk. So clearly by dad's own admission of negligence, improper supervision that Doctor McColgan testified to, clearly we have present inability, clearly we have that. This is a dependent child.

Id. at 168-69.

After finding the child dependent, the Court addressed the issue of child abuse:

> When father further testifies that he's been throwing a child, a baby, an infant into the air since the child was three months old and that the mother has warned him on more than one occasion not to and the father has admitted without questioning from anyone else that he's done it and then continued to do it without mom's presence, then the Court must look further at the statute. And what does the

---

[9] Mr. Hamilton is also the kinship provider to the child. Id. at 148.

statute say? "any recent act, [failure to act] or series of such acts or failure to [act] by the perpetrator which creates an imminent risk of serious physical injury." That is clear and convincing. The Court has no choice...based upon that testimony that it's an admission that goes through with the act. The Court does find child abuse.

Id. at 170-71

After considering all of the testimony and evidence at the adjudicatory hearing, the Court found by clear and convincing evidence that the Child was dependent and committed him to the custody of DHS. Id. at 20. The Court also made a finding of child abuse with regard to Father. This appeal followed.

Father has raised the following issues on appeal[10]:

1. Appellant avers the Trial Court erred in adjudicating Child dependent, in that the evidence to have been insufficient to substantiate the adjudication.

2. Appellant additionally avers the Trial Court erred in the removal of the Child, in that the evidence to have been insufficient to sustain placement into agency custody; and finally

3. Appellant avers the Trial Court erred in making a finding of child abuse, in that the evidence to have been insufficient for that as well.

### Discussion

Father has raised three issues on appeal in his Pa.R.A.P. 1925(b) Statement.

### I.    The Trial Court did not err in Adjudicating the Child Dependent.

First, Father argues that there was insufficient evidence to support the adjudication of the Child.

Pursuant to 42 Pa.C.S. § 6302, a "dependent child" is defined, in relevant part, as one who "is without proper parental care or control, subsistence, education as required by law, or

---

[10] *Sic* (from Father's 1925(b) statement).

7

other care or control necessary for his physical, mental, or emotional health, or morals." Further, "[a] determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places *the health, safety or welfare of the child at risk...*" 42 Pa.C.S. § 6302 (emphasis added). A finding of dependency must be supported by **clear and convincing evidence.** In re J.C., 5 A.3d 284, 288 (Pa. Super. 2010). This means "evidence that is so clear, direct, **weighty** and **convincing** as to enable the **trier of fact** to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." Id. "In the course of conducting this inquiry, the court should of course receive evidence from all **interested parties.**" In re C.M.T., 861 A.2d 348, 356 (Pa. Super. 2004) (citations omitted). Additionally, "the judge should receive, and if necessary should seek out, evidence from objective, disinterested witnesses, e. g., neighbors, teachers, social workers, and psychological experts." Id. "If a child is adjudicated dependent under the Juvenile Act, he or she cannot be separated from his or her parents absent a showing that the separation is clearly necessary." In the Interest of C.P., 836 A.2d 984, 987 (Pa. Super. 2003).

The standard of appellate review which the Pennsylvania Superior Court employs in cases of dependency is as follows:

> [W]e must accept the facts as found by the trial court unless they are not supported by the record...We review for abuse of discretion...[W]e accord great weight to the court's fact-finding function because the court is in the best position to observe and rule on the credibility of the parties and witnesses.

In the Interest of C.M., 882 A.2d 507, 513 (Pa. Super. 2005). Accordingly, the Superior Court's scope of review "is of the broadest possible nature." In Re C.J., 729 A.2d 89, 92 (Pa. Super. 1999). Specifically, with dependency proceedings:

> [O]ur scope of review is broad. Nevertheless, we will accept those factual findings of the trial court that are supported by the record because the trial judge

8

is in the best position to observe the witnesses and evaluate their credibility. We accord great weight to the trial judge's credibility determinations. Although bound by the facts, we are **not** bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate.

In re C.B., 861 A.2d 287, 294 (Pa.Super.2004).

Here, the Court determined that there was clear and convincing evidence that the Child was dependent under 42 Pa.C.S. § 6302. In making this finding, the Court heard testimony from several witnesses and carefully considered all of the evidence that was presented at the adjudicatory hearing. The evidence that was presented supported the finding that proper parental care and control was not immediately available to the Child by Father, and that the child's health, safety and welfare were at risk.

Specifically, the Court heard testimony that Father admitted "I'm guilty of neglect for turning my back" on the infant. Id. at 123. In addition to Father admitting that his neglect resulted in the injury of the Child, Father also admitted to throwing the Child in the air; "since my son's been about three months, four months...that was our little joyous time. Like I make him laugh." Id. at 119-20.

This gave the Court grave concerns about the children's safety and welfare. As the Court stated at the adjudicatory hearing in response to Father's counsel's argument:

> When father further testifies that he's been throwing a child, a baby, an infant into the air since the child was three months old and that the mother has warned him on more than one occasion not to and the father has admitted without questioning from anyone else that he's done it and then continued to do it without mom's presence, then the Court must look further at the statute. And what does the statute say? "any recent act, [failure to act] or series of such acts or failure to [act] by the perpetrator which creates an imminent risk of serious physical injury." That is clear and convincing. The Court has no choice...based upon that 'testimony that it's an admission that goes through with the act. The Court does find child abuse.

Id. at 170-71

9

Based on the testimony received at the adjudicatory hearing, the evidence clearly showed by clear and convincing evidence, that the Child was without proper parental care and the Court was compelled to find, based upon the facts before it, that Father placed the health, safety, and welfare of the children at risk. As such, the Court properly found that the child was dependent child within the meaning of the statute and placed him in the custody of DHS.

## II.     The Trial Court did not err in Placing the Child into Agency Custody.

Second, Father avers that the Court erred in removing the Child from the home and placing the child into agency care.

According to 42 Pa.C.S.A § 6351, after a child is found to be dependent, the Court may then make a disposition of the child in the best interest of the "safety, protection and physical, mental, and moral welfare of the child." § 6351(a)-(b). Prior to the disposition of the child, the following requirements of §6351 (b) must be placed on the order[11]:

(1) that continuation of the child in his home would be contrary to the welfare, safety or health of the child; and

(2) whether reasonable efforts were made prior to the placement of the child to prevent or eliminate the need for removal of the child from his home, if the child has remained in his home pending such disposition; or

(3) if preventive services were not offered due to the necessity for an emergency placement, whether such lack of services was reasonable under the circumstances; or

(4) if the court has previously determined pursuant to section 6332 (relating to informal hearing) that reasonable efforts were not made to prevent the initial removal of the child from his home, whether reasonable efforts are under way to make it possible for the child to return home; and

---

[11] See Court's Exhibit C for the Order of Adjudication.

10

(5) if the child has a sibling who is subject to removal from his home, whether reasonable efforts were made prior to the placement of the child to place the siblings together or whether such joint placement is contrary to the safety or well-being of the child or sibling.

The court shall not enter findings under paragraph (2), (3) or (4) if the court previously determined that aggravated circumstances exist and no new or additional reasonable efforts to prevent or eliminate the need for removing the child from the home or to preserve and reunify the family are required.

Based on the order of adjudication, the Child was taken out of Mother's home after a finding that the Child was dependent and not safe in Mother's home.

Despite the fact that the Child was not removed from Father's care, Father still posed a danger to the Child. It was by Father's own admission that his negligence lead to the Child's broken arm. Id. at 123, 132. Further, Father knew that he was not allowed in Mother's home as part of the DHS safety plan[12]. Id. at . Yet there is documentation that Father violated the imposed safety plan by visiting the Child in his home.

For the foregoing reasons, the Court did not err in placing the Child in the custody of the agency.

## III. The Trial Court did not err in Finding Child Abuse Against Father

Finally, Father asserts that there was insufficient evidence to find child abuse.

For a finding of child abuse, the Juvenile Act does not require proof that the parent has committed or condoned abuse, but merely evidence that the child is without proper parental care. In re R.R., 686 A.2d 1316, 1317-18 (1996); *see also* 42 Pa.C.S. § 6302(1) (explaining that a determination of lack of parental control may be based upon evidence of conduct by the parent that places the health, safety, or welfare of the child at risk). In determining whether there exists

---

[12] Father claims that he did not know he was not allowed to visit with the Child but moved out of the house and is currently staying at a separate residence. Id. at 125, 133, 140-41.

11

proper care, acts and omissions of a parent must weigh equally since parental duty includes protection of a child from the harm others may inflict. In re R.P., 957 A.2d 1205, 1211-12 (2008); *citing to* In re R.W.J., 826 A.2d 10 (Pa.Super.2003). Child Abuse includes " any recent act or failure to act…[which causes] nonaccidental serious physical injuries…[or] any recent act, failure to act or series of such acts or failures to act…which creates an imminent risk of serious physical injury [or] serious physical neglect…which endangers a child's life or development or impairs the child's functioning." 23 Pa.C.S. § 6303(b)(1)(i),(iii), (iv). Serious physical injury is any injury that causes "severe pain" or "significantly impairs" the child's ability to function physically. Id. At 6303(a); see also In re L.Z., 111 A.3d 1164, 1174 (2015).

In the instant case, there was ample uncontested testimony of serious physical injury to the child.

The Court noted that although Dr. McColgan could not state with a reasonable degree of medical certainty that the Child was the victim of child abuse, Father's own admissions showed child abuse. Id. at 168-69. Especially when:

> [F]ather further testifies that he's been throwing a child, a baby, an infant into the air since the child was three months old and that the mother has warned him on more than one occasion not to and the father has admitted without questioning from anyone else that he's done it and then continued to do it without mom's presence, then the Court must look further at the statute. And what does the statute say? "any recent act, [failure to act] or series of such acts or failure to [act] by the perpetrator which creates an imminent risk of serious physical injury." That is clear and convincing. The Court has no choice…based upon that testimony that it's an admission that goes through with the act. The Court does find child abuse.

Id. at 170-71.

In addition to Father's own admissions, Dr. McColgan testified that:

> In a non-ambulatory child where the child didn't cause the injury himself that of course makes us think about the possibility of could child abuse have occurred. The fracture is a pretty significant fracture, as you can see it goes through the bone of his arm so it would have required a significant amount of force…It's not

12

something that you would see with routine care of an infant, but, again, pulling or yanking a child … is not routine care either…There is no reason to believe he had medical bone disease or something wrong with his bones to lead to his bones to break more easily that another five month old male.

Id. at 14-15. Dr. McColgan also testified that the level of pain for the fracture would have been severe for the Child. Id. at 20.

For the foregoing reasons, the Court did not err in its finding of child abuse.

### Conclusion

For these reasons, the Court respectfully submits that its decision be affirmed.

BY THE COURT,

_____
VINCENT L. JOHNSON, J.

Dated: March 24, 2016

13